**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
---------------------------------------------------------X
:
GLASSNOTE ENTERTAINMENT GROUP, :
LLC, :
: Index No. _____
Plaintiff, :
:
-against- : **COMPLAINT**
:
MC DJ RECORDING and DONALD :
GLOVER, II p/k/a CHILDISH GAMBINO, :
:
Defendants. :
---------------------------------------------------------X

Plaintiff Glassnote Entertainment Group, LLC ("Glassnote"), by and through its attorneys, Loeb & Loeb LLP, as and for its Complaint against Defendants mc DJ Recording and Donald Glover, II p/k/a Childish Gambino, alleges as follows:

### INTRODUCTION

1. This is an action for declaratory judgment to determine the entitlement to digital performance royalties earned from the non-interactive streaming of sound recordings by the musical artist Donald Glover p/k/a Childish Gambino and authorized and commercially exploited by Glassnote.

2. Glassnote is widely recognized as one of the music industry's premier independent record labels, having launched the careers of dozens of the world's leading independent music artists.

3. In 2011, Donald Glover, who until that point had released only a handful of mixtapes and had never recorded a studio album, entered into an agreement (the "License Agreement") with Glassnote through his services corporate alter ego mc DJ Recording (collectively with Donald Glover, "Glover"). Pursuant to the License Agreement, Glover agreed

to record up to three albums for Glassnote and granted to Glassnote the exclusive right to exploit the master recordings on those albums, including the exclusive right to manufacture, sell, distribute, and market reproductions thereof and to publicly perform such master recordings. In consideration, Glassnote agreed to pay Glover a royalty equal to fifty percent (50%) of Net Proceeds, as that term is defined in the License Agreement.

4. From 2011 through 2017, Glover and Glassnote enjoyed a productive and profitable creative and business relationship. During that period, Glassnote released three studio albums recorded by Glover—*Camp*, *Because the Internet*, and *"Awaken, My Love!"*—as well as several mixtapes and EPs. Glassnote has paid Glover nearly Eight Million Dollars ($8,000,000) in royalties generated over that period and expects to pay Glover another approximately Two Million Dollars ($2,000,000) in pipeline royalties within the next 90 days according to standard and agreed upon accounting practices, in addition to any other royalties that will come due in the future.

5. The approximately Ten Million Dollars ($10,000,000) Glover has received or is soon to receive from Glassnote is exclusive of digital performance royalties generated by non-interactive streams—fees paid by streaming services such as Pandora, Spotify, SiriusXM, and other webcasters for digital radio plays—which were received not by Glassnote, but instead by the performance rights organization SoundExchange, pursuant to Section 114 of the U.S. Copyright Act, and paid directly to Glover.[1] Section 114 requires that SoundExchange distribute 50% of such royalties to record labels such as Glassnote, as the owner of the exclusive public

---

[1] "Non-interactive" digital performance royalties refer to digital radio plays and are district from "interactive" digital performance royalties, which are paid in connection with on-demand streaming of specific songs. Both of these types of royalties are further distinguishable from digital downloads, *e.g.*, digits track sales through online music stores such as iTunes.

2

performance right; 45% to featured recording artists such as Glover; and 5% to all non-featured artists (*e.g.*, producers, engineers, backup musicians, session players) on the tracks at issue.

6. Upon information and belief, Glover has received over $700,000 in public performance royalties paid to him directly by SoundExchange to date.

7. In late 2017, the License Agreement expired. Shortly thereafter, Glover, apparently unsatisfied with the approximately $10 million in royalties already paid or due to him by Glassnote and the 45% of the public performance royalties from SoundExchange, took the position that he was entitled to the entirety of Glassnote's 50% share of public performance royalties from SoundExchange—and that Glassnote was not entitled to any such royalty.

8. Glassnote has repeatedly conveyed to Glover over the past several months that his position is untenable—but Glover has not relented. He has continued to demand from Glassnote payments corresponding to SoundExchange royalties which he is legislatively and contractually precluded from receiving. Most recently, Glover, through his representatives, has demanded the payment of $1.5 million from Glassnote for resolution of the SoundExchange royalty dispute under threat of legal action. Given Glover's intransigence, Glassnote has no choice but to seek a declaration that it, and not Glover, is entitled to the 50% portion of the SoundExchange monies, and hereby requests such relief.

## PARTIES

9. Plaintiff Glassnote Entertainment Group, LLC is a Delaware limited liability corporation with its principal place of business in New York, New York.

10. Defendant Donald Glover, II is a natural person residing in California. Glover is a musical artist who often performs under the moniker "Childish Gambino."

11.     Defendant mc DJ Recording is a California corporation with its principal place of business at 10960 Wilshire Blvd., Suite 1900, Los Angeles, CA 90024.  Upon information and belief, mc DJ Recording is a corporation formed by Glover to furnish his services as a recording artist and to manage his musical recordings.

## JURISDICTION AND VENUE

12.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship and the amount in controversy exceeds $75,000.  This action for declaratory judgment is brought pursuant to 28 U.S.C. § 2201, which is within the exclusive jurisdiction of federal courts pursuant to 28 U.S.C. § 1331.

13.     Venue of this action is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this District and/or a substantial part of property that is the subject of the action is situated in this District, and because the subject written agreement specifies this District as the venue for any disputes thereunder.

## FACTUAL ALLEGATIONS

14.     Glassnote was founded by music industry veteran Daniel Glass in 2007. Since its inception, Glassnote has been widely regarded as one of the premier independent record labels in the world.

15.     Glassnote has had remarkable success cultivating musical talent in the indie rock, alternative rock, electronica, and alternative hip hop genres, having helped launch the careers of some of the most critically acclaimed independent musical acts of the past decade.  Several of its artists have gone on to win Grammy awards and achieve multi-platinum and certified gold status after signing with the label.

16. Glassnote has received a host of industry awards for its cultivation of musical talent. Among other things, it has been recognized as the industry's "Best Indie Label" by *Rolling Stone*, "Label of the Year" by the A2IM Libera Awards, which honor excellence in the independent music community, and the "#1 Independent Label" by *Billboard Music*.

17. Glassnote first signed Glover to a record deal in 2011. At the time, Glover was principally known as a sitcom writer and actor, having written for NBC's *30 Rock* from 2006 to 2009 and having acted in the first two seasons of NBC's *Community* from 2009 to 2011.

18. Glover's music career, however, was nascent. He had independently released a handful of mixtapes, but had not signed to a major record label nor released any major studio albums.

19. The parties memorialized their deal in a License Agreement dated August 24, 2011 between Glassnote and mc DJ Recording, a corporation formed by Glover which entered the agreement "f/s/o Donald Glover p.k.a. 'Childish Gambino.'"

20. Although Glover retained ownership of the master sound recordings which he created over the course of the parties' relationship (the "Masters"),[2] he conveyed certain exclusive rights to Glassnote with respect to those recordings and their physical reproductions ("Records").

21. In Paragraph 4.01 of the License Agreement, Glover conveyed to Glassnote, among other things, "the exclusive right . . . to manufacture, sell, distribute and market Records derived from the Masters . . . and to otherwise exploit and publicly perform all such Masters," "the exclusive right to publicly perform and broadcast, and to authorize others to publicly

---

[2] A "master recording" is a sound recording that embodies a particular performance of a musical composition. The copyright in a master recording is separate and distinct from the copyright in the underlying musical composition. *See United States v. Am. Soc'y of Composers (In re Cellco P'ship)*, 663 F. Supp. 2d 363, 368 (S.D.N.Y. 2009).

5

perform and broadcast, the Masters," and "the exclusive right to distribute and sell Records derived from Masters by means of digital transmission or so-called 'electronic transmission.'"

22. Glassnote, meanwhile, bore 100% of the economic risk in connection with Glover's recording activities. Among other things, Glassnote advanced Glover $50,000 in connection with his first album, recoupable from any future royalties, assumed all production and manufacturing costs in connection with Glover's Records, and expressly agreed to spend a minimum of $200,000 to market the commercial release of his albums and generate additional sales—an amount that ultimately Glassnote far surpassed over the course of the parties' relationship.

23. In exchange for their mutual rights and obligations, Glassnote agreed to pay Glover a royalty of 50% of Net Proceeds, as defined in the License Agreement, derived from the exploitation of Glover's Records.

24. From 2011 to 2017, Glassnote released several studio albums recorded by Glover, each of which increasing earned Glover commercial success and critical acclaim.

25. Glassnote released Glover's first studio album, *Camp*, in November 2011. That album went on to sell over 200,000 copies and peaked at #11 on the U.S. Billboard Top 200.

26. Glassnote released Glover's next studio album, *Because the Internet*, in December 2013. That album debuted at #7 on the U.S. Billboard Top 200 and earned Glover his first Grammy Award nomination, for Best Rap Album. In 2016, it was certified Gold by the Recording Industry Association of America ("RIAA"), having sold over 500,000 album-equivalent units.

27. In December 2016, Glassnote released Glover's third studio album, *"Awaken, My Love!"*—a commercial breakthrough for Glover. That album, peaking at #5 on the U.S.

Billboard Top 200, was certified Gold by the RIAA less than a year after its release. The album received Grammy Award nominations for Album of the Year, Best Urban Contemporary Album, Record of the Year, and Best R&B Song, and earned him the Grammy Award for Best Traditional R&B Performance.

28. In addition to the three studio albums, Glassnote also released several mixtapes and EPs recorded by Glover during that same period, including *Royalty* (2012), *STN MTN* (2014), and *Kauai* (2014).

29. Glover's relationship with Glassnote was enormously profitable over this period. From 2011 through 2017, Glassnote collected and paid to Glover approximately $8 million in royalties in connection with the Records it released on his behalf. Glover will also receive another approximately $2 million in pipeline royalties from Glassnote within the next 90 days according to standard and agreed upon accounting practices.

30. In addition to the approximately $10 million that Glassnote has paid or will pay to Glover, Glover has, upon information and belief, received over $700,000 in digital performance royalties for non-interactive steams directly from the performance rights organization SoundExchange.

31. SoundExchange acts as a collection and distribution agent with respect to digital performance royalties under Section 114 of the U.S. Copyright Act. 17 U.S.C. § 114(g)(2) provides that "[a]n agent designated to distribute receipts from the licensing of [digital] transmissions," such as SoundExchange, "shall distribute such receipts as follows":

> (A)  50 percent of the receipts shall be paid to the copyright owner of the exclusive right under section 106(6) of this title [*i.e.*, 17 U.S.C. § 106(6)] to publicly perform a sound recording by means of a digital audio transmission.
>
> (B)  2 1/2 percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Musicians (or any successor entity) to

be distributed to nonfeatured musicians (whether or not members of the American Federation of Musicians) who have performed on sound recordings.

(C) 2 1/2 percent of the receipts shall be deposited in an escrow account managed by an independent administrator jointly appointed by copyright owners of sound recordings and the American Federation of Television and Radio Artists (or any successor entity) to be distributed to nonfeatured vocalists (whether or not members of the American Federation of Television and Radio Artists) who have performed on sound recordings.

(D) 45 percent of the receipts shall be paid, on a per sound recording basis, to the recording artist or artists featured on such sound recording (or the persons conveying rights in the artists' performance in the sound recordings).

32. As defined by statute, Glassnote is the owner of the exclusive right to publicly perform Glover's master recordings under Sections 106(6) and 114(g)(2) of the U.S. Copyright Act, and Glover is the featured artist on those recordings.

33. For the most part, digital public performance royalties were paid directly into SoundExchange, to be distributed among Glassnote (50%), Glover (45%), and non-featured artists (5%). However, beginning in 2017, Glassnote's distributor Universal Music Group ("UMG") entered into a direct deal with Pandora Radio pursuant to which royalties from streams of Glover's Records on Pandora Radio were paid by Pandora to UMG, which collected its distribution fee from Glassnote's share and paid to SoundExchange the artist shares for distribution.

34. Upon information and belief, from 2012 to date, both Glover and Glassnote have received over $700,000 in digital performance royalties for non-interactive streams from SoundExchange, while non-featured artists on Glover's Records have received under $100,000 in connection therewith.

35. On or about October 31, 2017, the License Agreement expired. Shortly thereafter, Glover's representatives contacted Glassnote and claimed that Glover was owed, and

8

should have been paid by Glassnote, all digital performance royalties paid to Glassnote by SoundExchange pursuant to 17 U.S.C. § 114(g)(2)(A).

36. Effectively, Glover maintains that of the nearly $1,600,000 in digital performance royalties generated since 2012,[3] SoundExchange should have paid him 95%—or over $1,500,000—while his producers, engineers, musicians, and backup artists should have been paid less than $100,000 collectively, and Glassnote, which, as noted above, shouldered the economic risk of Glover's commercial releases, should have been paid nothing.

37. In doing so, Glover seeks to have Glassnote forfeit royalties to which it is clearly entitled under both 17 U.S.C. § 114(g)(2) and the License Agreement.

38. Glover's claim, however, is untenable. As noted above, in the License Agreement, Glover conveyed to Glassnote "the exclusive right to publicly perform" his sound recordings. Accordingly, pursuant to 17 U.S.C. § 114(g)(2), it is Glassnote—not Glover—which is "the copyright owner of the exclusive right under [17 U.S.C. § 106(6)] to publicly perform [Glover's] sound recording[s] by means of a digital audio transmission" and is entitled to "50 percent of the receipts" collected and distributed by SoundExchange. *See* 17 U.S.C. § 114(g)(2)(A). Glover is entitled to "45 percent of [such] receipts," as "the recording artist or artists featured on [those] sound recording[s]." *See id.* § 114(g)(2)(D).

39. Inasmuch as Glover received his 45% featured artist's share of digital public performance royalties directly from SoundExchange, none of those royalties were or could have been used by Glassnote to recoup any of its expenses incurred in producing and marketing Glover's records.

---

[3] This amount includes amounts collected by UMG as a distribution fee.

40. Glover has continued to maintain that he is entitled to Glassnote's share of the SoundExchange royalties, and, despite recent attempts to resolve this issue, the parties are at an impasse.

41. On May 15, 2018, Glover's legal representatives wrote to Glassnote demanding that that Glassnote "immediately pay" to Glover "one hundred percent (100%) of the [SoundExchange] Rights Owner Share [it] received from SoundExchange on his behalf."

42. Having received no such immediate payment, approximately a week later, on May 22, 2018, Glover's legal representatives again wrote to Glassnote, warning that "we are left with no choice but to escalate this matter and seek all legal remedies."

43. On June 28, 2018, in a final attempt to extract payment from Glassnote, Glover's legal representatives demanded "with respect to owed SoundExchange royalties—a payment of $1,500,000 as well as 100% of the 'rights owner' share of SoundExchange royalties on a moving forward basis, in exchange for general mutual releases, waivers of all claims, confidentiality and each party bearing its own fees and costs," and further demanded that such payment be made on or before July 6, 2018.

44. That $1.5 million demand far exceeds any amount currently in dispute with respect to SoundExchange payments received by Glassnote—and, in any event, as set forth above, Glover is not entitled to such payments. Accordingly, Glassnote has declined to meet Glover's demand.

**FIRST CAUSE OF ACTION**
**(Declaratory Judgment)**

45. The allegations contained in Paragraphs 1 through 44 above are incorporated by reference, as though set forth fully herein.

46. Pursuant to 17 U.S.C. § 114(g)(2) and the License Agreement, Glassnote is entitled to a 50% share of digital performance royalties paid by SoundExchange in connection with Glover's sound recordings as the owner of the exclusive public performance right with respect thereto.

47. Glover and mc DJ Recording have nonetheless asserted, in pre-suit correspondence, that they—and not Glassnote—are entitled to that same 50% share of digital performance royalties paid by SoundExchange in connection with Glover's sound recordings.

48. The position taken by Glover and mc DJ Recording, although not based on any logical or supportable reading of 17 U.S.C. § 114(g)(2) and/or the License Agreement, has created a cloud on Glassnote's entitlement to those monies.

49. By reason of the foregoing, a real and justiciable controversy exists between the parties, and Glassnote is entitled to a declaration, pursuant to 28 U.S.C. § 2201, that:

   a. During all relevant times, Glassnote is and was the copyright owner of the exclusive right under 17 U.S.C. § 106(6) to publicly perform sound recordings created by Glover under the License Agreement, by means of a digital audio transmission;

   b. During all relevant times, Glassnote is and was entitled to the 50% "rights owner" share of digital performance royalties paid by SoundExchange pursuant to 17 U.S.C. § 114(g)(2)(A) in connection with sound recordings created by Glover under the License Agreement; and

   c. During all relevant times, Glover and mc DJ Recording are and were not entitled to the 50% "rights owner" share of digital performance royalties paid by SoundExchange pursuant to 17 U.S.C. § 114(g)(2)(A) in

connection with sound recordings created by Glover under the License Agreement.

**WHEREFORE**, Glassnote respectfully seeks relief and demands judgment in its favor and against Glover and mc DJ Recording, jointly and severally, as follows:

a) Awarding declaratory judgment for Glassnote as set forth in Paragraph 49 above;

b) Awarding judgment for Glassnote's cost and attorneys' fees in this action, as provided for in 17 U.S.C. § 505;

c) Awarding Glassnote all taxable costs, expenses, and disbursements with respect to this action; and

d) Awarding Glassnote such other and further relief as the Court deems just and proper.

Dated: New York, New York
July 6, 2018

LOEB & LOEB LLP

By: */s/ Barry I. Slotnick*
Barry I. Slotnick, Esq. (BS-9796)
bslotnick@loeb.com
Frank D. D'Angelo, Esq. (FD-0911)
fdangelo@loeb.com
345 Park Avenue
New York, New York 10154-1895
Phone: (212) 407-4000
Fax: (212) 407-4990

*Counsel for Plaintiff Glassnote Entertainment Group, LLC*

16439793