# UNITED STATES DISTRICT COURT

# FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GLASSNOTE ENTERTAINMENT GROUP, LLC,  :
                                      :
                         Plaintiff,   :      18-cv-6167 (LGS)
                                      :
            v.                        :
                                      :   **ANSWER, DEFENSES**
MC DJ RECORDING and DONALD GLOVER II  :   **AND COUNTERCLAIMS**
p/k/a CHILDISH GAMBINO,               :
                                      :   **DEMAND FOR JURY TRIAL**
                         Defendants.  :
                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                      :
MC DJ RECORDING,                      :
                                      :
               Counterclaim-Plaintiff,:
                                      :
            v.                        :
                                      :
GLASSNOTE ENTERTAINMENT GROUP, LLC,   :
                                      :
               Counterclaim-Defendant.:
                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Defendants mc DJ Recording ("DJR") and Donald Glover II p/k/a Childish Gambino ("Glover," and together with DJR, "Defendants"), by their attorneys, Jonathan D. Davis, P.C., for their Answer to the Complaint, dated July 6, 2018, filed by Plaintiff Glassnote Entertainment Group, LLC ("Glassnote"), denies each and every allegation not specifically admitted in this Answer and states to each correspondingly numbered paragraph of the Complaint as follows:

## INTRODUCTION

1.   Paragraph 1 of the Complaint alleges legal conclusions, opinions, and other matters for which no response is required to be pled.  To the extent any further response is required,

Defendants deny the allegations therein, except admit that Glassnote purports to allege a claim for declaratory judgment concerning its entitlement to certain monies earned from the exploitation of sound recordings embodying Glover's vocal performances.

2.   Paragraph 2 of the Complaint alleges conclusions, opinions, and other matters for which no response is required to be pled.  To the extent that any further response is required, Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations therein, except admit that Glassnote is an independent record label.

3.   Defendants deny the allegations in Paragraph 3 of the Complaint, except admit that sound recordings embodying Glover's vocal performances have been released with and without Glassnote, and that DJR and Glassnote entered into the License Agreement, dated as of August 24, 2011 ("License Agreement"), and respectfully refer the Court to that agreement for its true terms, meaning, and import.

4.   Defendants deny the allegations in Paragraph 4 of the Complaint, except admit that the albums *Camp*, *Because the Internet*, and *Awaken, My Love!*, which embody the vocal performances of Glover, were released by Glassnote, and that Glassnote has paid DJR royalties concerning those albums, which amount is, in part, the subject of this lawsuit, and deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations concerning the amount and timing of so-called "pipeline royalties" yet-to-be paid or other royalties that will become due in the future.

5.   Paragraph 5 of the Complaint alleges legal conclusions, opinions, and other matters for which no response is required to be pled.  To the extent that any further response is required, Defendants deny the allegations therein, except admit that SoundExchange, assuming it is paying out 100% of the digital royalties earned, is supposed to pay Glover, as the "featured artist" of his

sound recordings, 45% of the digital performance royalties from non-interactive streaming services, and 5% of the digital performance royalties from non-interactive streaming services are supposed to be paid to "non-featured artists" on those recordings, and respectfully refer the Court to Section 114 of the Copyright Act for its true terms, meaning, and import.

6.   Defendants deny the allegations in Paragraph 6 of the Complaint, except admit that some amount of digital performance royalties were paid by SoundExchange.

7.   Defendants deny the allegations in Paragraph 7 of the Complaint, except admit that the License Agreement expired and that Glassnote was not entitled to receive all of the digital performance royalties from SoundExchange attributable to the copyright owner's share of public performance rights concerning the sound recordings embodying Glover's vocal performances.

8.   Defendants deny the allegations in Paragraph 8 of the Complaint, except admit that Glassnote and DJR have an ongoing dispute over each other's entitlement to digital performance royalties paid or to be paid by SoundExchange concerning the sound recordings embodying Glover's vocal performances, and deny knowledge or information concerning the truth or falsity of the allegation about Glassnote's lack of "choice" of how to resolve this dispute.

## PARTIES

9.   Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 9 of the Complaint, except admit that Glassnote is an independent record label.

10.   Defendants admit the allegations in Paragraph 10 of the Complaint, except aver Glover is sometimes professionally known as "Childish Gambino."

11.   Defendants deny the allegations in Paragraph 11 of the Complaint, except admit that DJR is a California corporation that has an address of 10960 Wilshire Blvd., Suite 1900, Los Angeles, California 90024, and that DJR furnishes Glover's recording services.

## JURISDICTION AND VENUE

12.   Paragraph 12 of the Complaint alleges legal conclusions, opinions, and other matters for which no response is required to be pled.  To the extent that any further response is required, Defendants deny the allegations therein, except deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegation concerning the existence of subject matter jurisdiction.  Nevertheless, Defendants accept Plaintiff's representations to the Court concerning the citizenship of its members.

13.   Paragraph 13 of the Complaint alleges legal conclusions, opinions, and other matters for which no response is required to be pled.  To the extent that any further response is required, Defendants believe the Court may exercise personal jurisdiction over them and that venue in this District is proper.

## FACT ALLEGATIONS

14.   Paragraph 14 of the Complaint alleges opinions and other matters for which no response is required to be pled.  To the extent that any further response is required, Defendants deny the allegations therein, except admit that Glassnote is an independent record label, which was purportedly founded by Daniel Glass.

15.   Paragraph 15 of the Complaint alleges opinions and other matters for which no response is required to be pled.  To the extent that any further response is required, Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations therein, except admit that Glassnote has a roster of recording artists involved in various music genres.

16.   Paragraph 16 of the Complaint alleges opinions and other matters for which no response is required to be pled.  To the extent that any further response is required, Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations therein.

17.   Defendants deny the allegations in Paragraph 17 of the Complaint, except admit that: (i) DJR and Glassnote entered into the License Agreement, and respectfully refer the Court to that agreement for its true terms, meaning, and import, and (ii) Glover is an actor and writer, who has appeared on television, including on the television show *Community*.

18.   Defendants deny the allegations in Paragraph 18 of the Complaint, except admit that, prior to entering into the License Agreement, Glover self-released mixtapes and other recordings and was not signed to a major record label.

19.   Defendants deny the allegations in Paragraph 19 of the Complaint, except admit that: (i) DJR and Glassnote entered into the License Agreement, and respectfully refer the Court to that agreement for its true terms, meaning, and import, and (ii) Glover caused the formation of DJR.

20.   Defendants deny the allegations in Paragraph 20 of the Complaint, except admit that under the License Agreement certain rights and obligations were imposed upon Glassnote and DJR respectively, and respectfully refer the Court to that agreement for its true terms, meaning, and import.

21.   Defendants deny the allegations in Paragraph 21 of the Complaint, except admit that under the License Agreement certain rights and obligations were imposed upon Glassnote and DJR respectively, and respectfully refer the Court to that agreement for its true terms, meaning, and import.

22.   Defendants deny the allegations in Paragraph 22 of the Complaint, except admit that under the License Agreement certain rights and obligations were imposed upon Glassnote and DJR respectively, including advances contractually required of Glassnote, and respectfully refer the Court to that agreement for its true terms, meaning, and import, and deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegation concerning the remaining allegations.

23.   Defendants deny the allegations in Paragraph 23 of the Complaint, except admit that under the License Agreement, certain rights and obligations were imposed upon Glassnote and DJR respectively, including payment by Glassnote to DJR of 50% of Net Proceeds, as that term is defined in the License Agreement, derived from the exploitation of the sound recordings thereunder, and respectfully refer the Court to that agreement for its true terms, meaning, and import.

24.   Defendants deny the allegations in Paragraph 24 of the Complaint, except admit that Glassnote has released albums embodying Glover's vocal performances, which have achieved measurable recognition and success.

25.   Defendants deny the allegations in Paragraph 25 of the Complaint, except admit that, according to various Internet sites, the album *Camp* was released in November 2011, that it sold more than 200,000 copies, and that it received recognition in the music-rating charts.

26.   Defendants deny the allegations in Paragraph 26 of the Complaint, except admit that, according to various Internet sites, the album *Because the Internet* was released in December 2013, that it received RIAA Gold certification, and that it received recognition in the music-rating charts.

6

27.   Defendants deny the allegations in Paragraph 27 of the Complaint, except admit that, according to various Internet sites, the album *Awaken, My Love!* was released in December 2016, that it received RIAA Gold certification, that it received recognition in the music-rating charts, and that it was nominated for various awards, including multiple Grammy Awards, winning the Grammy Award for the single *Redbone* in the category of Best Traditional R&B Performance.

28.   Defendants deny the allegations in Paragraph 28 of the Complaint, except admit that Glassnote has released or made available to the public sound recordings other than studio albums embodying Glover's vocal performances, including *Royalty*, *STN MTN*, and *Kauai*.

29.   Defendants deny the allegations in Paragraph 29 of the Complaint, except admit that Glassnote has released sound recordings embodying the vocal performances of Glover, which have resulted in the payment of royalties to DJR, which amount is, in part, the subject of this lawsuit, and deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations concerning the amount and timing of so-called "pipeline royalties" yet-to-be paid.

30.   Defendants deny the allegations in Paragraph 30 of the Complaint, except admit that SoundExchange has paid Glover, as the "featured artist" of his sound recordings, digital performance royalties it has received from non-interactive streaming services.

31.   Paragraph 31 of the Complaint alleges legal conclusions, opinions, and other matters for which no response is required to be pled.  To the extent that any further response is required, Defendants deny the allegations therein, and respectfully refer the Court to Section 114 of the Copyright Act for its true terms, meaning, and import.

32.   Defendants deny the allegations in Paragraph 32 of the Complaint, except admit that DJR is the copyright owner, and Glover is the "featured artist," of the sound recordings embodying his vocal performances that are the subject of the License Agreement.

33.   Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 33 of the Complaint.

34.   Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 34 of the Complaint, except admit that SoundExchange, assuming it is paying out 100% of the digital royalties earned, is supposed to pay Glover, as the "featured artist" of his sound recordings, 45% of the digital performance royalties from non-interactive streaming services, and 5% of the digital performance royalties from non-interactive streaming services are supposed to be paid to "non-featured artists" on those recordings.

35.   Defendants deny the allegations in paragraph 35 of the Complaint, except admit that the License Agreement expired in or about 2017 and that a dispute arose between Glassnote and DJR concerning whether Glassnote was or is entitled to any share of the digital performance royalties earned from the exploitation of certain sound recordings embodying Glover's vocal performances.

36.   Defendants deny knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in Paragraph 36 of the Complaint, except deny that Glassnote "shouldered the economic risk" of Glover's commercial releases, and admit that a dispute arose between Glassnote and DJR concerning whether Glassnote was or is entitled to any share of the digital performance royalties earned from the exploitation of certain sound recordings embodying Glover's performances.

37.   Paragraph 37 of the Complaint alleges legal conclusions, opinions, and other matters for which no response is required to be pled.  To the extent that any further response is required, Defendants deny the allegations therein, and respectfully refer the Court to the License Agreement for its true terms, meaning, and import.

8

38.   Paragraph 38 of the Complaint alleges legal conclusions, opinions, and other matters for which no response is required to be pled.  To the extent that any further response is required, Defendants deny the allegations therein, except admit that under the License Agreement, certain rights and obligations were imposed upon Glassnote and DJR respectively, and respectfully refer the Court to: (i) the License Agreement for its true terms, meaning, and import, and (ii) Section 114 of the Copyright Act for its true terms, meaning, and import.

39.   Defendants deny the allegations in Paragraph 39 of the Complaint, except admit that SoundExchange, assuming it is paying out 100% of the digital royalties earned, is supposed to pay Glover, as the "featured artist" of his sound recordings, 45% of the digital performance royalties from non-interactive streaming services, and 5% of digital performance royalties from non-interactive streaming services are supposed to be paid to the "non-featured artists" on those recordings, and, to the extent that such royalties were paid Glover, Glassnote would not be able to recoup producing or marketing expenses, if any, from such royalties.

40.   Defendants deny the allegations in Paragraph 40 of the Complaint, except admit that a dispute arose and remains between Glassnote and DJR concerning whether Glassnote was or is entitled to any share of the digital performance royalties earned from the exploitation of certain sound recordings embodying Glover's performances, and respectfully refer the Court to the License Agreement for its true terms, meaning, and import.

41.   Defendants deny the allegations in Paragraph 41 of the Complaint, and respectfully refer the Court to: (i) the May 15, 2018 letter from Julian K. Petty, Esq. to Chris Scully for its true terms, meaning, and import and (ii) the License Agreement for its true terms, meaning, and import.

42.  Defendants deny the allegations in Paragraph 42 of the Complaint, and respectfully refer the Court to the May 22, 2018 letter from Julian K. Petty, Esq. to Barry Slotnick, Esq. for its true terms, meaning, and import.

43.  Defendants deny the allegations in Paragraph 43 of the Complaint, and respectfully refer the Court to the June 28, 2018 email from Staci Jennifer Riordan, Esq. to Barry Slotnick, Esq. for its true terms, meaning, and import.

44.  Defendants deny the allegations in Paragraph 44 of the Complaint, except admit that the amount due and owing with respect to SoundExchange royalties will be determined during discovery in this action, and respectfully refer the Court to the License Agreement for its true terms, meaning, and import.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment)

45.  In response to Paragraph 45 of the Complaint, Defendants repeat and reallege their responses to paragraphs 1 through 44 of the Complaint as if fully set forth at length herein.

46.  Paragraph 46 of the Complaint alleges legal conclusions, opinions, and other matters for which no response is required to be pled.  To the extent that any further response is required, Defendants deny the allegations therein, except admit that under the License Agreement, certain rights and obligations were imposed upon Glassnote and DJR respectively, and respectfully refer the Court to:  (i) the License Agreement for its true terms, meaning, and import and (ii) Section 114 of the Copyright Act for its true terms, meaning, and import.

47. Defendants deny the allegations in Paragraph 47 of the Complaint, and respectfully refer the Court to the pre-suit correspondence for its true terms, meaning, and import.

48.  Paragraph 48 of the Complaint alleges legal conclusions, opinions, and other matters for which no response is required to be pled.  To the extent that any further response is

10

required, Defendants deny the allegations therein, except admit that under the License Agreement, certain rights and obligations were imposed upon Glassnote and DJR respectively, and respectfully refer the Court to: (i) the License Agreement for its true terms, meaning, and import and (ii) Section 114 of the Copyright Act for its true terms, meaning, and import.

49.   Defendants deny the allegations in Paragraph 49 of the Complaint, except admit that a real and justiciable controversy exists between the parties, and that under the License Agreement certain rights and obligations were imposed upon Glassnote and DJR respectively, and respectfully refer the Court to: (i) the License Agreement for its true terms, meaning, and import, and (ii) Section 114 of the Copyright Act for its true terms, meaning, and import.

## REQUESTED PRAYER FOR RELIEF

50.   Defendants request that this Court deny any of the relief sought by Glassnote in the WHEREFORE clause, including each subpart therein.

## DEFENSES

By way of defenses, and without assuming any burden of proof not otherwise required by law, DJR and Glover allege the following:

## FIRST DEFENSE

The Complaint and any purported claims for relief fails to state a claim upon which relief can be granted.

## SECOND DEFENSE

The Complaint and any purported claims for relief therein are barred, precluded, and/or limited by the statute of limitations or any time-based defense, including laches.

## THIRD DEFENSE

Plaintiff's claims are barred, in whole or in part, by doctrines of waiver, estoppel and/or ratification.

## FOURTH DEFENSE

Plaintiff's claims are barred by the doctrine of unclean hands.

## FIFTH DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrine of accord and satisfaction.

## SIXTH DEFENSE

Plaintiff's claims are barred, precluded, and/or limited by the failure of a condition precedent or contractual condition.

## SEVENTH DEFENSE

Plaintiff's claims are barred, precluded, and/or limited by contractual limitations, incontestability, and notice provisions.

## EIGHTH DEFENSE

Plaintiff's claims are barred, precluded, and/or limited by termination, abrogation, abandonment, and/or rescission.

## NINTH DEFENSE

Plaintiff's claims are barred, precluded, and/or limited because Plaintiff would be unjustly enriched if it were to recover on its claims.

## TENTH DEFENSE

Plaintiff's claims are barred, precluded, and/or limited to the extent that the harm alleged to have been suffered by the Plaintiff is the result of acts or omissions on the part of Plaintiff or other persons over whom Defendants have no control.

## ELEVENTH DEFENSE

Plaintiff's claims are diminished, reduced, and/or barred by Plaintiff's failure to mitigate its alleged damages.

## TWELFTH DEFENSE

Plaintiff's claims are barred by reason of its consent to, and/or acquiescence in, actions of any of the Defendants.

## THIRTEENTH DEFENSE

Plaintiff's claims are set-off or to be offset by reason of payments or credits already received, or to be received, under the License Agreement.

## FOURTEENTH DEFENSE

Defendants reserve the right to assert any other defenses that may become available or appear during discovery or otherwise in this action, and it reserves the right to amend this Answer to assert any such additional defenses by motion or otherwise.

## COUNTERCLAIMS

Counterclaim-Plaintiff mc DJ Recording ("Counterclaim-Plaintiff" or "DJR") for its counterclaims against Counterclaim-Defendant Glassnote Entertainment Group, LLC ("Counterclaim-Defendant" or "Glassnote") alleges, as follows:

## PRELIMINARY STATEMENT

1. DJR is a California corporation formed by Donald Glover II, who is sometimes professionally known as "Childish Gambino," to furnish Glover's services as a recording artist and to own and manage his musical recordings.

2. After successfully releasing several music projects on his own, Glover was pursued by Glassnote, an established independent record label, to exclusively exploit and distribute his musical recordings and to participate in other aspects of his entertainment endeavors.

3. DJR and Glassnote entered into a licensing agreement, as of August 24, 2011, which was titled the "License Agreement," and split profits as provided therein.

4. Despite making millions of dollars for Glassnote, attracting notoriety, interest, and cache for the label, and securing multiple Grammy nominations and awards, Glassnote refuses to account and pay to DJR royalties that it collected on DJR's behalf, in breach of its warranties, representations, and covenants under the License Agreement.

5. The amounts due and owing were determined, in part, by an audit that was conducted in 2017 for the period July 1, 2014 through December 31, 2016, which determined that substantial monies were due and owing to DJR for that period, in addition to a yet-to-be quantified share of Net Proceeds for amounts that have been earned since that audit was conducted.  Not surprisingly, Glassnote referred to the audit as a "diligent and thorough review of [its] accounting".

6. By its countersuit, DJR seeks: (i) a declaration and order that DJR is entitled to, among other things, its share of SoundExchange royalties, now and in the future, in accordance with the License Agreement and (ii) payment of all royalties and other monies not accounted for or paid to DJR, including as detailed in the audit described below and as further revealed through discovery.

14

## PARTIES

7.   DJR is a citizen of the State of California and is a corporation organized under its laws.  DJR maintains its principal place of business at 10960 Wilshire Blvd., Suite 1900, Los Angeles, California 90024.

8.   Upon information and belief, Glassnote is a citizen of the State of New York and is a limited liability company organized under the laws of Delaware.  Glassnote's principal place of business is located at 770 Lexington Avenue, 12th Floor, New York, New York 10065.

9.   Upon information and belief, Glassnote has two members: Daniel S. Glass, a domiciliary of New York, and L. Christopher Scully, a domiciliary of Connecticut. Glassnote is therefore a citizen of those states for the purposes of diversity jurisdiction.

## JURISDICTION AND VENUE

10.   The jurisdiction of this Court is based upon 28 U.S.C. § 1332(a)(1) as the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different States.    This Court also has supplemental jurisdiction over the counterclaims under 28 U.S.C. § 1367(a) in that the counterclaims are so related to the claim asserted by Glassnote such that they form part of the same case or controversy.

11.   Personal jurisdiction over Glassnote is proper in this Court because: (a) Glassnote transacts business in the State of New York; (b) Glassnote's wrongful conduct occurred in the State of New York and in this District; (c) the License Agreement was entered into and performed, in part, in this District; and (d) the License Agreement provides in paragraph 27.03 that the parties agree to "submit[] exclusively to the jurisdiction of … the Federal District Courts located in New York County[,]" New York.

12.   Venue is proper in the District pursuant to 28 U.S.C. § 1391 because (a) Glassnote resides in this District, and (b) a substantial part of the events or omissions giving rise to the Counterclaims occurred in this District.  In addition, the License Agreement establishes venue in New York County, New York.

## LICENSE AGREEMENT

13.   DJR is a corporation formed and owned by Glover for the purpose of furnishing his exclusive musical recording services and to own and manage those recordings.

14.   On or about August 24, 2011, DJR entered into the License Agreement with Glassnote.  Glover is not a party to that agreement.

15.   The License Agreement acknowledges, in paragraph 10A.01(b), that "this Agreement is a net profit split[.]"  Separate and apart from the rights and obligations concerning the exploitation of musical recordings, the parties agreed to share, in varying percentages, net profits/revenues, from the following endeavors: endorsements, publishing, merchandising, and certain audiovisual works.

16.   Under the License Agreement, in paragraph 2.01(b), under the general heading "**TERM/LICENSE PERIOD/RECORDING OBLIGATION**", DJR contracted with Glassnote to furnish Glover's services to "record [his] musical performances exclusively for Licensee [Glassnote] … and [further agreed that he] shall not record for, or offer to enter into or enter into any agreement (either directly or otherwise), with any third party regarding [his] services as a music recording artist anywhere in the Territory."

17.   Also, in paragraph 2.01(c) of the License Agreement, DJR granted Glassnote an "Initial Period" which required the delivery by DJR of one long play ("LP") album, together with granting options to Glassnote to extend the Initial Term for up to two additional option periods for

LPs, provided, however, specified terms and conditions were met by Glassnote, for the "License Term," as defined in paragraph 2.01(a) thereof.

18.  In exchange for DJR's furnishing of Glover's exclusive recording services, in paragraph 4 of the License Agreement, Glassnote was granted, among other things, the right to manufacture, distribute, sell, advertise, promote, market, publicly perform, broadcast, and synchronize "Records" and "Masters," as defined in the License Agreement, and to distribute and exploit Records and Masters by means of digital transmission throughout the world.

19.  In exchange for DJR's performance, in paragraph 3 thereof, under the heading "**LICENSEE FEE/ADVANCES**", Glassnote agreed, among other things, to pay a recoupable license fee for each LP, a flat amount of $50,000 for the first LP and, in accordance with a formula for each option LP, as well to pay royalties for the exploitation of each Record or Master.

20.  In paragraph 10 thereof, under the heading "**ROYALTIES**", Glassnote agreed to pay DJR a royalty equal to 50% of the "Net Proceeds" realized from the exploitation of each Record or Master.

21.  "Net Proceeds" is defined in paragraph 10.02(a) thereof, as "the amount, if any, by which 'Gross Revenues' exceed 'Deducted Expenses'".

22.  "Gross Revenues" is defined in paragraph 10.02(b) thereof as "gross receipts received by Licensee or credited to the Licensee in the Territory and specifically derived from the sale (including without limitation royalties or fees) of Records or Videos derived from Masters and all and (sic) any other exploitations of the Masters or Videos hereunder."

23.  The License Agreement further provides for a specific exclusion: "Gross Revenues will not include any sums received by Licensee in respect of so-called blanket industry agreements (unless such sums are specifically and directly attributable to exploitations of Masters

or Records derived therefrom or such sums are inclusive of monies attributable to the 'artist's share' in such cases that income shall be reasonable (sic) apportioned and accounted for hereunder to the Artist).  For the avoidance of doubt, Gross Revenues shall include any and all advances received by Licensee from any sub-licensees save that where such advances are attributable to Masters and master recordings not the subject hereof then all such advances shall be pro rated …."

24.  "Deducted Expenses" is defined in paragraph 10.02(c) thereof as "all reasonable, actual, out of pocket, documented expenses properly paid or properly incurred by Licensee in respect of the Masters or Promotional Videos, the distribution or sale of Records derived therefrom, other exploitations of such Masters or Promotional Videos, or otherwise in connection with the subject matter of this agreement (unless set forth otherwise herein), and pursuant to the terms of this Agreement."  It provides a non-exhaustive list of such Deductible Expenses.

25.  And, in paragraph 4.01, under the heading "**GRANT OF RIGHTS**", the definition of Gross Revenues are further limited:  "(For the avoidance of doubt, if and to the extent that Licensor distributes or sells any Records derived from the Masters by means of digital transmission or electronic transmission in the Territory, Licensor shall turn over to Licensee income derived therefrom [*other than statutory monies specifically set aside for performances embodied on master recordings (or for the performers performing such performances), e.g.[,] SoundExchange, Neighboring Rights monies*] *for accounting and, if applicable, payment of Royalties hereunder*) [emphasis added]."

26.  The License Agreement granted DJR customary audit rights to inspect Glassnote's books and records to ensure Glassnote properly and accurately accounted and paid DJR.

27.  In paragraph 11.03 thereof, under the heading "**ACCOUNTINGS**", it provides that "all royalty statements and all other accounts rendered by Licensee to Licensor shall be

binding upon Licensor and not subject to objection by Licensor for any reason unless specific objection, in writing[,] stating the basis thereof is given to Licensee within two (2) years following Licensor's receipt of such statement.  Licensor shall be foreclosed from maintaining any action, claim or proceeding against Licensee in any forum or tribunal unless commenced within two and one-half (2 ½) years following Licensors receipt of such statement."

28.  It further provides that, if an audit establishes that royalties have been underpaid "by ten per cent (10%) or more or ten thousand dollars ($10,000) (whichever is greater)", then Glassnote "shall pay the reasonable costs of the accountant conducting the examination."

29.  Under paragraph 13 thereof, under the heading "**WARRANTIES AND REPRESENTATIONS**", it provides that "[e]ach party (the 'Indemnitors') agrees to and does hereby, save and hold the other party (the 'Indemnitee') *harmless of and from any and all loss and damage (including reasonable outside legal fees) arising out of or connected with any breach by the Indemnitor of any warranty, representation or covenant* made by the Indemnitor herein which has been reduced to a last judgment rendered by a court of competent jurisdiction or which has been settled with the Indemnitor's prior written consent (which shall not be unreasonably withheld or delayed.) Subject to the foregoing, the Indemnitor will reimburse the Indemnitee on demand for any payment made at any time after the date hereof in respect of any liability or claim for which the Indemnitee is entitled to be indemnified hereunder."  (Emphasis added.)

30.  In paragraph 27.01 thereof, under the heading "**MISCELLANEOUS**," the parties acknowledged that "[t]his Agreement sets forth the parties' entire understanding relating to the subject matter and all prior and contemporaneous understandings relating to the same have been merged herein."

31. Paragraph 27.01 also provides that "[n]o modification, amendment, waiver, termination or discharge of this Agreement or any of its terms shall be binding upon either party unless confirmed by a document signed by a duly authorized officer of each of the parties."

32. To underscore the meaning and intent of this provision, paragraph 27.05 provides that "[n]o deletion, addition, revision, change or other alteration in drafts of this Agreement prepared prior to the execution of this Agreement shall be used for the purpose of construction or interpretation of any term, provision or language of this Agreement."

33. Paragraph 27.03 thereof further provides that "[t]his Agreement has been entered into in the State of New York, and its validity, construction, interpretation and legal effect shall be governed by the laws of the State of New York[.]"

## MASTERS EXPLOITED UNDER THE LICENSE AGREEMENT

34. Pursuant to the License Agreement, DJR, in connection with the furnishing of Glover's exclusive recording services to Glassnote, created and delivered multiple Records and Masters, which Glassnote commercially released, including "*Camp*" in November 2011, "*Because the Internet*" in December 2013, and "*Awaken My Love!*" in December 2016.

35. Glover's second and third albums for Glassnote were certified Gold by the Recording Industry Association of America, each Master having sold over 500,000 album-equivalent units. Those albums earned Glover multiple nominations and awards, including Grammy nominations and, for the third album, the Grammy Award for Best Traditional R&B Performance.

## GLASSNOTE AUDIT

36.   In 2017, in accordance with its audit rights under the License Agreement, DJR audited Glassnote's books and records regarding Glassnote's accountings and payments to DJR for the period July 1, 2014 through December 31, 2016 (the "Audit").

37.   On or about January 16, 2018, DJR provided Glassnote with a written audit report (the "Audit Report"), detailing Glassnote's multiple breaches under the License Agreement, and demonstrating significant amounts that it failed to account and pay to DJR.

38.   In the course of multiple responses to the Audit Report, Glassnote asserted, among other things, that DJR was not entitled to any portion of the so-called "copyright owner's" share of digital performance royalties collected by SoundExchange, notwithstanding the express terms of the License Agreement.

39.   Glassnote's responses also largely disputed its non-payment or underpayment of other income streams generated by the exploitation of Records, Masters, Videos and other income properties under the License Agreement.

## GLASSNOTE'S BREACHES OF THE LICENSE AGREEMENT

40.   The Audit Report revealed, among other things, that Glassnote failed to pay DJR its share of digital transmission royalties collected by SoundExchange and paid to Glassnote.  It is those very royalties that are the sole subject matter of Glassnote's Complaint for a declaratory judgment against DJR and Glover.

41.   SoundExchange is an independent nonprofit performance rights administrator that collects and distributes royalties for non-interactive digital transmissions, including satellite, Internet radio, and cable television music channels.  Such royalties are mandated under the Digital Millennium Copyright Act of 1998 ("DMCA").

42.   Under the DMCA, fifty percent (50%) of such performance royalties are payable to or for the benefit of artists appearing on a sound recording ("Artist SoundExchange Royalties") and fifty percent (50%) of those royalties are payable to the copyright owner of the exclusive rights to public performance rights under § 106(6) of the Copyright Act ("Net Proceeds SoundExchange Royalties").

43.   The DMCA does not impose any prohibition on, or interfere with, a royalty recipient's distribution of royalties or other monies received under Section 114 of the Copyright Act.

44.   Under the License Agreement, Glassnote is obligated to pay DJR "a royalty equal to fifty (50%) percent of 'Net Proceeds'."  Despite the express terms of the License Agreement, Glassnote refuses to pay DJR any portion of the Net Proceeds SoundExchange Royalties.

45.   Net Proceeds SoundExchange Royalties are not excluded from the definition of Net Proceeds under the License Agreement.

46.   Glassnote contends in its Complaint that, even though "Glover retained ownership of the master sound recordings which he created over the course of the parties' relationship …, he conveyed certain exclusive rights to Glassnote with respect to those recording and physical reproductions", entitling Glassnote to 100% of the Net Proceeds SoundExchange Royalties:

> 32.   … Glassnote is the owner of the exclusive right to publicly perform Glover's master recordings under Sections 106(6) and 114(g)(2) of the U.S. Copyright Act, and Glover is the featured artist on those recordings.
>
> * * *
>
> 38. …[P]ursuant to 17 U.S.C. § 114(g)(2), it is Glassnote – not Glover – which is 'the copyright owner of the exclusive right under [17 U.S.C. § 106(6)] to publicly perform [Glover's] sound recording[s] by means of digital audio transmission' and is entitled to '50 percent of the receipts' collected and distributed by

SoundExchange. *See* 17 U.S.C. § 114(g)(2)(A). Glover is entitled to '45 percent of such receipts,' as 'the recording artist or artists featured on [those] recording[s]'. *See id.* §114(g)(2)(D).

*See* Complaint, ¶¶ 32, 38.

47. However, under paragraph 4.01 of the License Agreement, DJR is required to "turn over" to Glassnote "digital transmission or electronic transmission" income "*other than* statutory monies specifically set aside for performances embodied on master recordings (or the performers performing such performances) e.g.[,] SoundExchange, Neighboring rights monies (emphasis added)."

48. Therefore, any and all digital transmission monies earned and collected that are not excludable from DJR's turn over obligation are included in the computation of "Net Proceeds," which are split 50/50 between Glassnote and DJR, in accordance with paragraph 10.01 of the License Agreement.

49. Moreover, except where specifically provided in the License Agreement, namely paragraphs 4.01, 10.02(b), 17.01, 18, 19, and 26.01A, the definition of "Gross Revenues" in paragraph 10.02(b) does not delineate between one type of income and another - it plainly refers to "gross receipts received by [Glassnote] or credited to [Glassnote] in the Territory and specifically derived from Masters and all (sic) and any other exploitations of Masters or Videos hereunder."

50. The License Agreement does not treat the Net Proceeds SoundExchange Royalties any differently from other income included in the calculation of Gross Revenues.

51. And, nowhere does the License Agreement provide that Glassnote can determine for itself what income or other monies earned from the exploitation of Records, Masters, Videos,

or other exploitations covered by the License Agreement are to be split or otherwise shared with DJR.

52. Glassnote's unilateral retention of 100% of the Net Proceeds SoundExchange Royalties materially breaches DJR's rights under the License Agreement because it improperly computes Gross Revenues and understates the Net Proceeds that are distributable to both Glassnote and DJR.

53. The Audit Report further revealed that, based on Glassnote's books and records made available to the auditor, Glassnote materially breached the License Agreement by failing to account and pay DJR its share of Net Proceeds. The Audit Report was qualified in material respects due to the non-comprehensive nature of the materials Glassnote made available to the auditor for review.

54. The Audit Report showed, among other things, that DJR's share of Net Proceeds was underreported or withheld for the following reasons:

- Miscalculation of distribution fees chargeable to DJR concerning the exploitation of Glover's recordings in Canada. (Glassnote conceded it improperly deducted such distribution fees.)

- Underreporting international revenues, which amount was estimated based on either irregular or unreported periods, and the failure by Glassnote to properly register in all foreign territories, *e.g.*, UK/EU and SEA, all of which, upon information and belief, will be substantiated through discovery in the action.

(Glassnote conceded there could be unreported international income.)

- Miscalculation of producer royalties by taking excess deductions from DJR's share of royalties, including through the overpayment of producers and the application of incorrect producer/mixer rates for non-US sales. (Glassnote conceded producer royalties were miscalculated.)

- Miscalculation of DJR's share of Net Merchandising Profits.

- Misreporting of manufacturing expense charges. (Glassnote conceded making undocumented charges.)

- Deduction of excessive per unit manufacturing costs charged by Universal Music Group ("UMG") in contravention of the Distribution Agreement between UMG and Glassnote.

- Omission of interest payments on DJR's unpaid or underreported Net Proceeds. (Glassnote concedes interest is due but disputes the amount.)

- Omission of interest on and apportionment of UMG's advance payment to Glassnote for the right to distribute content licensed to Glassnote under the License Agreement.

55.  Because the Audit Report shows that DJR's share of Net Proceeds was underpaid by the greater of ten per cent or ten thousand dollars, Glassnote is liable for paying DJR's "reasonable costs of the accountant conducting the examination," in accordance with paragraph 11.03 of the License Agreement.

56. Although not addressed in the Audit Report, Glassnote also is liable to DJR for its reasonable counsel fees because Glassnote agreed to hold DJR "harmless of and from any and all loss and damage (including reasonable outside legal fees) arising out of or connected with any breach by [Glassnote] of any warranty, representation or covenant made by [it]," in accordance with paragraph 13.03 of the License Agreement.

57. DJR's claims against Glassnote alleged below are all within the contractual limitations period in the License Agreement and otherwise not barred.

## COUNT I
### (Breach of Contract)

58. Counterclaim-Plaintiff realleges each and every allegation in paragraphs 1 through 57 in the Counterclaims as if fully set forth herein.

59. The License Agreement is a valid and binding agreement between DJR and Glassnote.

60. DJR has performed all conditions, covenants, and promises required to be performed by it in accordance with the terms of the License Agreement.

61. As detailed above, Glassnote has breached the License Agreement in multiple respects, including by, among other things:

- Failing to pay DJR its share of the Net Proceeds SoundExchange Royalties.

- Underreporting international revenues.

- Miscalculating producer royalties.

- Underreporting Net Merchandising Profits.

- Overcharging manufacturing costs.

26

- Failing to pay DJR its portion of the UMG advance as well as the interest thereon that is due and owing to DJR.

62. As a direct and proximate result of Glassnote's breaches of the License Agreement, as alleged herein, DJR has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial, including from its expenditures for audit costs and reasonable counsel fees.

### COUNT II
### <u>(Breach of the Duty of Good Faith and Fair Dealing)</u>

63. Counterclaim-Plaintiff realleges each and every allegation in paragraphs 1 through 62 of the Counterclaims as if fully set forth herein.

64. The License Agreement is a valid and binding agreement between DJR and Glassnote.

65. DJR has performed all conditions, covenants, and promises required to be performed by DJR in accordance with the terms of the License Agreement.

66. Glassnote has breached the covenant of good faith and fair dealing implied in the License Agreement by unfairly interfering with DJR's right to receive the benefits of the License Agreement by, among other things:

- Failing to reasonably allocate money and other payments received from third-party licensees, including SoundExchange, and depriving DJR of the funds which are directly attributable to Records, Masters, and Videos created by Glover.

- Failing to register with SoundExchange DJR's share of the copyright owner's share of the Net Proceeds SoundExchange Royalty.

- Failing to conduct proper audits of third-party licensees of the Records, Masters, and Videos covered by the License Agreement to ensure that DJR receives it proper and correct share of Net Proceeds from the exploitation of the Records, Masters, and Videos created by Glover.

67. Furthermore, under the terms of the License Agreement, Glassnote has an obligation to properly calculate Gross Receipts and to allocate and pay Net Proceeds in good faith and consistent with that agreement.

68. Glassnote has breached its duty of good faith and fair dealing by misallocating income received from third-parties, including SoundExchange, in a manner which is arbitrary and insupportable.

69. As a direct and proximate result of Glassnote's breaches of the implied covenant of good faith and fair dealing under the License Agreement, as alleged herein, DJR has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial, including from its expenditures for audit costs and reasonable counsel fees.

### COUNT III
### (Accounting)

70. Counterclaim-Plaintiff realleges each and every allegation in paragraphs 1 through 69 of the Counterclaims as if fully set forth herein.

71. In accordance with the License Agreement, and DJR's entitlement to receive its share of Net Proceeds from the exploitation of Glover's recordings and related matters, DJR is entitled to an accounting from Glassnote.

72.    Glassnote is in possession, custody, or control of the books, records, statements, and other financial information necessary for determining the amount of Net Proceeds due and owing to DJR.

73.    DJR is informed and believes, and based thereon alleges, that the accounts related to the Net Proceeds and other royalties due to DJR are complicated making it impracticable for it to allege a precise amount herein.  The true and correct amount due and owing to DJR can only be ascertained by an accounting performed under the supervision of the Court.

### COUNT IV
### (Declaratory Judgment)

74.    Counterclaim-Plaintiff realleges each and every allegation in paragraphs 1 through 73 of the Counterclaims as if fully set forth herein.

75.    An actual controversy has arisen and now exists between DJR and Glassnote regarding DJR's entitlement to Net Proceeds from the exploitation of Records, Masters, Videos and other items under the License Agreement.

76.    For example, Glassnote contends that DJR is not entitled to any share of the Net Proceeds SoundExchange Royalties.  DJR, on the other hand, contends that it is entitled to 50% of the Net Proceeds SoundExchange Royalties.

77.    Glassnote further contends that DJR is not entitled to any accrued interest on UMG's advance payment to it, claiming that UMG is not a "sublicensee" under the License Agreement.  DJR, on the other hand, contends that UMG is such a sublicensee, as that term is used under the License Agreement.

78.    A judicial determination is therefore necessary and appropriate to ascertain DJR's rights and Glassnote's obligations and duties to DJR under the License Agreement.  DJR seeks: (i) a declaration and order that DJR is entitled to, among other things, its share of Net Proceeds

SoundExchange Royalties, now and in the future, in accordance with the License Agreement and (ii) payment of all royalties and other monies not accounted for or paid to DJR, including as detailed in the Audit Report and as further revealed through discovery.

### COUNT V
### (Breach of Fiduciary Duty)

79.   Counterclaim-Plaintiff realleges each and every allegation in paragraphs 1 through 78 of the Counterclaims as if fully set forth herein.

80.   The License Agreement created a fiduciary relationship between Glassnote and DJR based on "special circumstances" due to the nature of their business.   That business relationship imposed upon Glassnote the duty to treat DJR with the highest degree of good faith and honesty, to deal fairly with, to zealously protect DJR's interests, to preserve and promote DJR's business opportunities, and not to act contrary to DJR's business interests.

81.   Glassnote and DJR did not enter into a typical record contract.   DJR is the owner of the Masters and licensed them to Glassnote.   In a typical recording contract, the record label owns the master recordings and underwrites the costs of creating them.

82.   The License Agreement was in effect for 7 years, a lengthy period in which Glassnote reaped millions of dollars and controlled, directed, participated in, and/or benefitted from, among other things:

- The sole and exclusive exploitation of the Records and Masters and the royalties earned therefrom.

- The "writer's share" of public performance income from the exploitation of the musical compositions embodied in Records and Masters.

- The sole and exclusive exploitation of Licensed Property embodied in Licensed Products, as those terms are defined in the License Agreement.

- The exploitation of certain audiovisual works.

83.   Glassnote breached its fiduciary duties by, among other things, engaging in the following:

- Failing to maximize the exploitation of the Records, Masters, and Licensed Products throughout the world.

- Failing to accurately account and pay DJR the share of Net Proceeds due to DJR by, among other things, underreporting international revenues, miscalculating producer royalties, underreporting Net Merchandising Profits, overcharging manufacturing costs, and failing to pay DJR the portion of the UMG advance as well as the interest thereon that is due and owing to DJR.

- Failing to pay DJR the share of the Net Proceeds SoundExchange Royalties due DJR.

- Failing to reasonably allocate money and other payments received from third-party licensees, including SoundExchange, and depriving DJR of the funds directly attributable to Records, Masters, and Videos.

- Failing to register with SoundExchange DJR's share of the copyright owner's share of the Net Proceeds SoundExchange Royalty.

- Failing to conduct proper audits of third-party licensees of the Records, Masters, and Videos to ensure that both Glassnote and DJR receive their proper and correct share of Net Proceeds.

84.   The above-stated conduct, and other conduct which may be revealed in discovery, constitute multiple breaches of Glassnote's fiduciary duties because the License Agreement conferred substantial benefit on Glassnote to the detriment of DJR, and DJR directed and controlled the methods and means of exercising its rights under the License Agreement, preferring its interests over those of DJR.

85.   Moreover, upon information and belief, Glassnote maintains an accounting department that is bound by an independent professional duty to accurately account both to Glassnote and to DJR.  That duty exists independently from the License Agreement because, upon information and belief, the failure to properly account would subject the accountants employed by Glassnote to professional review, regardless of the License Agreement's terms.

86.   Glassnote breached its duty of loyalty by preferring its interests above DJR's interests, including by retaining for itself Net Proceeds earned under the License Agreement that belonged to DJR, or failing to act to exploit the Records, Masters, and Licensed Products to earn Gross Revenues.

87.   Based on the foregoing, while DJR cannot ascertain the exact amount of damages it has sustained as a direct and proximate cause of Glassnote's various breaches, Glassnote must disgorge some or all of the monies it earned under the License Agreement.

88. In addition, because Glassnote's acts were willful and malicious, oppressive and taken in conscious disregard of DJR's expectations, DJR is entitled to punitive and exemplary damages against Glassnote in an amount to be determined at trial, but sufficient to punish and deter Glassnote from engaging in similar conduct in the future.

## COUNT VI
## (Negligence)

89. Counterclaim-Plaintiff realleges each and every allegation in paragraphs 1 through 88 of the Counterclaims as if fully set forth herein.

90. Because of the special relationship that was created between Glassnote and DJR, Glassnote owed DJR fiduciary duties, including the duties of utmost good faith and loyalty, which included an obligation to competently act on behalf of DJR in connection with the exploitation of DJR's catalog of Glover sound recordings in all international territories and the maintenance of complete and accurate business records needed to accurately account to DJR and observe the duties imposed upon parties entrusted to hold money for the benefit of another.

91. Glassnote has breached its duty of reasonable care to DJR in failing to exercise that degree of skill and diligence exercised by an ordinary member of the record business community in managing DJR's catalog, exploiting that catalog throughout the world, and preparing complete and accurate statements necessary to fulfill Glassnote's fiduciary accounting obligation it owed to DJR.

92. As a direct and proximate result of Glassnote's negligence, DJR has suffered, and will continue to suffer, monetary damages in an amount to be proven at trial, including from its expenditures for audit costs and reasonable counsel fees.

93. In addition, because Glassnote's acts were willful and malicious, oppressive, and taken in conscious disregard of DJR's expectations, DJR is entitled to punitive and exemplary

damages against Glassnote in an amount to be determined at trial, but sufficient to punish and deter Glassnote from engaging in similar conduct in the future.

      **WHEREFORE**, Defendants/Counterclaim-Plaintiff seeks judgment against Plaintiff/ Counterclaim-Defendant as follows:

      (a)   Dismissal of the Complaint in its entirety;

      (b)   On Count I of the Counterclaims, damages for Counterclaim-Defendant's breach of the License Agreement to be determined at trial, but in an amount exceeding the sum or value of $75,000, exclusive of interest or costs;

      (c)   On Count II of the Counterclaims, damages for Counterclaim-Defendant's breach of the implied covenant of good faith and fair dealing under the License Agreement, but in an amount exceeding the sum or value of $75,000, exclusive of interest or costs;

      (d)   On Count III of the Counterclaims, an accounting under Court supervision of the Gross Revenues under the License Agreement and the payment of DJR's proper and correct share of Net Proceeds thereunder.

      (e)   On Count IV of the Counterclaims, a judicial determination of the parties' contractual rights and duties under the License Agreement, including that DJR is entitled to its share of the Net Proceeds SoundExchange Royalties and payment of its proper and correct share of Net Proceeds;

      (f)   On Count V of the Counterclaims, compensatory, punitive, and exemplary damages for Counterclaim-Defendant's breach of fiduciary duties under the License Agreement, but in an amount exceeding the sum or value of $75,000, exclusive of interest or costs;

(g)   On Count VI of the Counterclaims, compensatory, punitive, and exemplary damages for Counterclaim-Defendant's negligence, but in an amount exceeding the sum or value of $75,000, exclusive of interest or costs;

(h)   An award of reasonable counsel fees and costs under the License Agreement or as allowable under any applicable law or statute;

(i)   An award of pre-judgment and post-judgment interest; and

(j)   Such other and further relief as the Court deems just and proper.

Dated:   September 14, 2018
              New York, New York

JONATHAN D. DAVIS, P.C.

By:      */s/ Jonathan D. Davis*
          Jonathan D. Davis
          Derek A. Williams
          10 Rockefeller Plaza
          Suite 1015
          New York, New York 10016
          (212) 687-5464

          *Attorneys for Defendants mc DJ Recording*
          *and Donald Glover II p/k/a Childish*
          *Gambino and Counterclaim-Plaintiff mc DJ*
          *Recording*

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Defendants/

Counterclaim-Plaintiff hereby demand a trial by jury.

Dated:  September 14, 2018
        New York, New York

                                JONATHAN D. DAVIS, P.C.


                       By:    */s/ Jonathan D. Davis*
                              Jonathan D. Davis
                              Derek A. Williams
                              10 Rockefeller Plaza
                              Suite 1015
                              New York, New York 10016
                              (212) 687-5464

                              *Attorneys for Defendants mc DJ Recording
                              and Donald Glover II p/k/a Childish
                              Gambino and Counterclaim-Plaintiff mc DJ
                              Recording*